Good morning. I'd like to start by saying that in looking at anti-discrimination litigation in today's climate, courts are compelled to look beyond the allegations that there was no racial invectives employed surrounding the subject incident. The reason for that is because if all discrimination cases require blazoned and outrageous discriminatory acts, our anti-discrimination laws lose their teeth, they lose their effect. Discrimination, because of our laws, has taken a more sophisticated tone. And because of that, it's incumbent upon the courts to look beyond the mere allegations, as in this case, that there was a legitimate non-discriminatory business practice that was engaged in on that Mother's Day in the year 2001. What the hotel would have this Court believe and, unfortunately, convince the trial court, the district court of, was that the purported reasons for allocation of hotel space on that given day was based on the existence of a reservation with the group that ultimately got the room. But at the same time, recognizes that neither writing, as signed by the hotel, conferred a guarantee of space. So the court must then look at, well, then, how did the hotel allocate space on that day? The hotel argues that Mr. Lindsay did not give adequate notice under the contract of 72 hours, and points to a letter dated 48 hours, which confirms many items in addition to the final count. What the hotel refuses to acknowledge, refuses, is that it accepted payment for the final count within the 72-hour period. Those are on $8,000, or was it $11,000? Well, the total was $11,000. The deposit was $8,000. The final count, the final payment, the final check was in the amount of $8,500 approximately. But Mr. Lindsay had previously deposited $3,000. Was there an oral statement to the hotel as to the number, the count? Yes. In addition to this letter that comes in? In addition to the oral number is the fact that Mr. Lindsay had booked this same event in the hotel four years prior. So there was a custom. When was the oral report as to the number of people who would be coming? Well, if you look at Excerpt of Record, page 42, you will see a letter October 22nd of 2000, seven months before the event, outlining the plans for the following-year Mother's Day event, talking about the Grand Ballroom, because they had been ---- did not notify the hotel in 72 hours prior to the event as to the number of people who would be coming. Now, I thought I picked up in the brief someplace that there was, in the first place, there was the payment, which was 72 hours in advance. But was there also an oral statement by Panache to the hotel as to the number? Yes. When did that occur? That was communicated telephonically. And if you look at Excerpt of Record number 57, you will see the writing confirming that made by the hotel. And why that is so important is they had to know the number of people to get to the final price. So by necessarily telling Panache, okay, you have to write us a check for $8,500 and something cents, they had to have the final count. And they had to have had it before the 10th, when he tendered the check for the final payment. To support that, you've got the document, number 57 in Excerpt of Record, which shows their handwriting calculating the final price based on 550 people guarantee. The hotel had notice of the number. What the hotel is arguing is because they, in addition to verbally telling them the number, in addition to the hotel accepting the payment, they went the extra step, which was they sent a formal letter on the 11th saying, look, just so that we all have our ducks in order here, we're expecting X, Y, and Z. And it's a two-page letter. The hotel argues to this Court, the letter is the confirming document that you should rely on. And it's disingenuous. With regard to the other explanation was that there was some sort of earlier confirmation of use of the grand ballroom for the other party. And that's the talking out of both sides of your mouth argument that the hotel is proffering. One, they're saying, Mr. Lindsay, your contract wasn't for the grand ballroom, because in our contracts, we don't specify. Well, I understand that neither written contract was for the grand ballroom, I believe. No. Neither contract. That's what I said. Neither written contract was for the grand ballroom. Correct. But I thought that there was a statement in there that the, I think it's Grimani Party or something? Yes. That had asked for the grand ballroom earliest. We can see both parties wanted the grand ballroom. The hotel, by design in doing their contracts, do not specify the event space because they want to maximize the space. So they internally assign the space depending on the size of the group. And that's what their policy is. Their policy is function space is assigned according to the size of the group. And yet in this case, that's not how function space was assigned. You had a 250 group in a room that would seat 900, and you had 600 women having lunch in the lobby of a hotel. What makes your prima facie case? Just run through that for a second. The prima facie case is as follows. Let me just interrupt you. Yeah. Where's the hotel? Refresh my memory. It's on Century Boulevard near the airport, near LAX. All those hotels. Okay. It's the western. Yes. Is that the first one closest to the airport? I'd have to ask my client. That's all right. I'm not sure. It's all right. Go ahead. The prima facie case is as follows. And this is, to me, it just, it jumps out, and I'm not sure why it didn't impress the district court, but you have, in April, I just want to get to the right document, in April, you have the western hotel faxing to Mr. Lindsay the room diagram for the grand ballroom. That's a writing confirming the space that is being negotiated under the contract. You have these faxes going back and forth with regard to staging, pipe and drape, all the requirements, how the tables will be set. These are documents from the western to Mr. Lindsay, and yet they come back and they say he didn't have any right to the grand ballroom. So that argument falls on, well, okay, is this a fraudulent business dealing that the hotel is engaging in? In other words, tell the customers they're going to get this room. Deliberately don't put it in the contract and give them whatever room you want. Well, I suppose, I mean, it might be a breach of contract, and the question is whether there's a prima facie case of racial discrimination. That's right. So now we look at the practice. In other words, you're telling this group they're going to get the grand ballroom. You are accepting money. It's not the two days before the event they said, I'm sorry, we made a mistake. We can't accept your money unless you agree to take other space. So you have the prima facie is they accept the money. They include by other writings, necessarily this diagram of the grand ballroom, that that is the room that's being given. So you've got a term, a negotiated term. Then on the night before the event, Mr. Lindsay's in the hotel and advises them, hey, you're not setting the room up according to the diagram. So they're put on notice the night before. They don't take any action until the following morning. And what do you have? You have Jacob Stark meet with Mr. Lindsay and his associates in the group. By his own sworn testimony, he says he never, never considered moving the Cermany group. Yet his hotel policy says you assign function space dependent upon the size of the group. So you have the food and beverage manager never considering moving the other group, which is 250. And by their diagram, they're closing off the grand ballroom. They're not even setting up the entire space. So that's what you have to look behind. You have to say, look, here's somebody who is violating their own stated hotel policy to accommodate a white group in the grand ballroom, 250 people. And you're making a hotel decision to seat 600 African Americans in the lobby of the hotel with people checking in and checking out. You ought to be able to just sort of tick those elements off, see, because you're running out of time. I mean, you make a real good speech, but, you know, just tell us what the basis of your prima facie case is. The basis is, in addition to that, is that you have the food and beverage manager, who states in his declaration and by deposition that he looked at the file for the Panache group and found that they had not paid timely or they had not given the count timely, which isn't true. So the stated reasons for giving the other group the room are not genuine. If you look behind their reasons, you see that they're not genuine. And that is the prima facie case. The prima facie case isn't genuine. Kennedy. Well, that's the step immediately after the prima facie case. I presume your prima facie case would be something like that. We contracted for the room. The room wasn't given to us. We are black. It was given to some whites after that. And that's my prima facie case. And then you look to them. What's the explanation? And they say, well, there was a scheduling snafu and the other parties were already in there and everything else. And then you can say, well, that was pretextual. Those are three steps, basically. I agree in the analysis. But I think if you just look at the face value of what their explanation is, it is also evidence of discrimination, because the reasons are beli credulity. And that's the point. Thank you. Okay. Thank you. May it please the Court. I am R.J. Hendricks on behalf of the appellees. What I'd like to do is first put into context the what we believe is the issue presented here. You know, this is a question of whether there was intentional discrimination. And it's important for the Justice to have a perspective. My clients are in the hospitality business. They will often be in situations where on one side you have one group wanting something and on another side you have another group wanting something. In this very instance, although there's been an allegation that the Carmarnie group was a white group, there really is no evidence that it was a white group. We know it was a bar mitzvah, which is a religious event, but we really don't know what the constitution of that group is. But even assuming that it were, okay, you're still dealing with two groups with protected status under the law, that if for some reason discrimination occurs, both would have standing to bring a suit. So the rock and a hard place that we're in right now is that if the event had gone to the other group, they, too, could be arguing, gee, well, that's discrimination. As a fundamental basis, it is so important, therefore, to require a plaintiff who brings this sort of action to come prepared to show the prima facie case, to come prepared to show a pretext. We do not want the court to do that. Scalia. Wouldn't you say that there's at least a genuine issue of material fact that a prima facie case was made? Gershengorn Oh, I would not agree with that, Justice Breyer. Scalia. Just tell me how that would fail. Gershengorn In the first instance, although they could demonstrate that as an African American contractor, they met the first element of a prima facie test, they could not demonstrate that, in fact, they had a contractual right or were denied a benefit provided to them pursuant to any contract. It would be the second prong of the test. In this instance, they contracted for event space. They were given event space. We accommodated that particular event. Scalia. Now, the judge, the district court, he decided, as I understand it, that that second element is attempted to contract for services. That sound like a good second element for the prima facie case? Gershengorn I think that that is an acceptable characterization of it. I think also what needs to be demonstrated as a part of a prima facie case, that not services that they were apparently denied. And I think this goes to the second prong of the, what we would contend is the prima facie case. You have to have some facts that create an inference of discrimination. And, again, in the setting of our business, it cannot be a 1981 case, you have to have a contract before you can meet that test? I believe you would need to demonstrate as a prima facie case that, yes, you actually have a contract. In the absence of a contractual right, at least in the facts of this case where there's no dispute that both parties had some contract, they would need to demonstrate in this case as a part of a prima facie case that they had a contractual right to the Grand Ballroom. And that somehow we interfered with that. Kennedy Let's just say it as a minimum that the hotel people that handled these transactions were sloppy. Well, what I would say is there appears to have been some sort of snafu. But, again, there's... Nobody seemed to know what's going on. You know, they can't find the paper, and they can't locate this lady that was first involved, and then they come up with one reason, and they come up with another reason. I mean, it was a mess. It was a mess. And, you know, just my own experience, I don't... I know that when you reserve space at a hotel for a dinner, you reserve a particular room. As did the Carmarnes, Your Honor. A particular room. You reserve, I want the Grand Ballroom. I want this room. I want that room. And then you've got to come up with a deposit, and there's a certain minimum number of people you have to bring. So people just don't contract for an event at a hotel and not know what room is going to be held. Oh, we have to see where they put us when we come in. I've never heard it work that way. Your point is well taken, but the point here is both groups were subject to those same requirements. You know, even if it made no sense, the fact of the matter is there's no showing that the Carmarnes were treated any better than was the Panoz group. When I go to the third point regarding the prima facie case, that is being similarly situated. And it's important to put this in perspective. What we're dealing with is the decision that Mr. Stark made, being confronted with two events he was not previously aware of when he received a call at home. And here he is confronted with the situation. You know, hopefully the law does not require perfection in that sense. Hopefully the law can allow people to make good faith decisions. And what he did was he made a good faith decision not predicated on race. He looked at the very documents that the hotel relies upon in looking at these matters, the booking sheet, the recap sheet, and the contract. And based upon those documents, he reached certain conclusions which are undisputed. That is, that the Carmarne group had contracted first, that at least in the hotel system as he was seeing, whether it was a mistake or not, at least from his state of mind, what he saw was the hotel had reserved for the Carmarnes the grand ballroom first. And he also understood that at that point, and I would point to the record of the deposition, the plaintiffs conceded they did not give notice until the 11th, which is not 72 hours in advance. So despite all of the tortured logic... Was there a telephone call which was at least 72 hours before the event that gave the number? Is there some evidence in the record of that? I don't believe that there is. But more importantly, there is no evidence whatsoever that Mr. Stark, when making this decision, understood that to be the case. So even if for some... Don't you think that he wouldn't necessarily have to have all the information if the other people in the Weston had this information, then isn't that sufficient to stick the Weston with whatever information their officials have? It has to be Stark, you think. In a case where we're talking about intentional discrimination, perhaps in the context of simply a breach of contract claim. But in the context of a case where we're talking about intentional discrimination, you are racist. In that context, Mr. Stark has to have that knowledge in order to attribute that stigma to my client. He did not have that knowledge. The knowledge that he had when he... Wasn't there someone there that knew about these transactions? Mr. Stark just kind of walked into it. That is correct, Your Honor. Where was the person that was in charge? Renetta... Renetta Williams. Renetta Williams. Where was she? We don't know. She quit. We don't know where she was. There was an attempt to contact her. Quit that day? I think it was a couple of days beforehand or a day beforehand. And we didn't even know that she had quit. You know, at the time that we were making these decisions, Mr. Stark did try to reach Ms. Williams and could not do so. Okay? So it's only... Hotel had to know that you had two groups that were coming in there to use the facilities. They knew that, didn't they? No, they did not, because the documents that were in our system showed the Panas group in the Grand Concourse and the concourse rooms, and it showed the Cremonti group in the Grand Ballroom. So if you look at the documents, there is no apparent conflict. We first became aware of a conflict as we're setting up for the Cremonti group, and someone from the Panas group says, wait a second, we should be in this room. That's the first time that we as the hotel, as we can see in this record, understood there was a conflict. If you take a look at what Ms. Williams did, Ms. Williams, as of April 16th, put in a booking report for the Panas group and booked them in the concourse room. They were never booked, at least for this event, in the Grand Ballroom. There's no document. So, again, coming back to the perspective of this is a discrimination case, looking at what Mr. Stark understood and knew based upon the documents, the documents showed the hotel just screwed up in this whole situation. Would you admit that? How can you run a business like that? Big Western Hotel, you know, and someone leaves. You don't even know they're fired or they left. And the guy wakes up and, you know, and he's looking at pieces of paper that aren't even put together in some organized fashion so he can get a picture of what's going on. Justice Ferguson, we're dealing with people. Let me tell you something. We're not justices, we're judges. My apologies. In the Ninth Circuit, there's no justice. It's an old joke. Walter Ailey came up with it. I use it in his memory. That we're dealing with people is undisputed. Ms. Williams did not notify the company at that point that she was quitting. Well, don't you think your company ought to make amends on this? Just as a decent thing to do? Well, for a matter of the record, they tried as a customer service issue to do so that day. Okay? They tried afterwards to deal with that. But the fact that a mistake happens does not mean that they are racist or that the decision was racist, which is the issue that they're trying to suggest. Was there potentially a customer service issue? It's not hard to satisfy the requirements of a prima facie case. Ordinarily, it might not be, but in this instance, Your Honor, respectfully, we submit that they have not shown that they are similarly situated to the Cremani group. They have not demonstrated that, again, they booked at the same time, that they put their deposits at the same time. They have not demonstrated that they were in the same state of being set up. You know, again, they've not demonstrated, based simply on, and from our perspective in this business especially, it's a very, well, we would submit that it would be an inappropriate test merely to say, gee, two people of different groups, that satisfies the prima facie case. In every situation, in so many situations, you may have that very issue. This Court will be flooded with every customer service dispute, oh, gee, they got quicker service than we did. Okay? They're Hispanic. We're Caucasian. Oh, gee, they got more water than we did. They're black. We're Asian. Okay? Every customer service dispute will become a 1981 suit if the mere standard is different races. You need something more than that to create an inference of discrimination, that race was the reason for the difference in treatment. And that's what's wholly lacking. There are no slurs here. There's no establishment of a policy that this grand ballroom was reserved for whites only or it was reserved as not to be included for blacks. They've used the room before. You're not dealing with a company that just excludes them. This is not a stereotypical country club situation where blacks are excluded. Okay? They've rented the facility before. That, too, is evidence that this is a customer service issue and not discrimination. But where's Mr. Stark today? Mr. Stark is still at the hotel. Still working there? He is, Your Honor. And again, for the record, and, you know, we didn't put it in because we didn't think it was at issue, but we did at the time make efforts to accommodate them. We, after the event, made efforts.  So we've tried to make amends. See that in the record. I saw in the record that that day you offered some alternatives to using the grand ballroom, but is there something in the record that shows that after this occurred, you offered them some additional freebies or something? I will admit, Your Honor, that that particular aspect is not there because we didn't think that it would be relevant. But in response to Your Honor's question, the point is we dealt with this as a customer service issue. This is not a situation that we don't want the panache group back at our hotel. That's not the issue. The issue is, for whatever reason, there was a snafu. Okay? And we don't know exactly what the basis of that is. Ms. Renetta Williams wasn't there. But at every step, we took steps to deal with the situation that we were confronted with. And in a discrimination context, you must look at what Mr. Stark understood at the time that he was called in to make this decision. Was it a perfect decision? I'm not going to submit to you that it necessarily was. But it was a good faith decision not predicated upon race. And on that basis, the district court was absolutely correct in ruling against the appellant in this instance and ruling in favor of the appellees on the motion for summary. Did Mr. Stark essentially the only actor that we're talking about? I mean, it's his decision. Is that clear from the record? It's his decision after he conferred with the general manager on that. And he merely reported the facts as he understood them, which again is, look, I have these two groups. One says it's the concourse room. The Karmanis say they're the grand ballroom. The Karmanis booked earlier than did Panache. And they're already set up basically with the Karmanis. Okay? That's the information. So he says based upon this, you know, we're going to continue with the Karmanis as they are. And we will attempt to make accommodations with the Panache group. That's what he conveyed. And based upon that, that's what they did. Again. I guess the one problem is, is the policy, I guess maybe Stark himself asserted, was that you decide who goes into what room by the size of the group. Your Honor, that is a policy with respect to initial bookings. As they're coming in and receiving the information, they will allocate that space based upon what they know at the time. That's not what we're dealing with here. We're dealing with at a different step, okay, where there's a problem, okay, there's a snafu, and this man must make a rushed decision, a snap decision as to what to do. Okay? There are other factors that can be and were considered. Okay? And that is one who booked it first, a basic sense of confirmation. I thought that the Panache group, they started their negotiations very early, didn't they, before the contract was signed with Carmani? They started some discussions. Those discussions were not memorialized in the agreement. In fact, they specifically refused to commit to those issues until there was a final contract. Mr. Lindsey himself made changes to the contract once it was drafted, never including specifically the Grand Ballroom as the space location. And, again, from the standpoint of Mr. Stark, he's looking at the company's documents. Now, the date of the contract, according to Mr. Stark's testimony, has not been used in the past to determine things of this sort. Is that right? The date of the contract, Mr. Stark said it's the size of the group, it's the dollars involved, that those are the things that dictate what space you're going to assign to a particular group. Is that right? At the time of initial booking. But Mr. Stark was not speaking about what do you do when you have some sort of unexpected conflict. That's not what he was speaking to. He was saying as a matter of course at the time of initial booking, those are factors that the company would apply. But the records that he had in the system that he looked at showed the Panache group in the concourse rooms, and it showed the Carmani group in the Grand Ballroom. Based upon that, having no prior sense of any of the history, remember, he's not the individual who had dealt with either group previously. He's put in a very human situation. How do I deal with this? On the one hand, he has documents in his own system saying Carmani's, at some point the company acknowledged they reserved the Grand Ballroom, and the documents for the Panache group don't show that. How does he resolve this? Okay. First and time. And then the lawsuit's against the hotel, not against Mr. Stark. Mr. Stark was the decision-maker, Your Honor, with respect to this decision. And so we are bound by the decision he made for the reasons that he made it. And the point that I'm trying to illustrate is, is that the reasons he utilized, none of them were used. But you're also bound by, you know, whatever transpired with Williams and with others there. Perhaps for a cause of action for, like, breach of contract, but not for a cause of action of intentional discrimination. Intentional discrimination requires a mens rea. It requires a state of mind to discriminate. And even if he's wrong, even if for, you know, poor judgment he deviated from particular policies, there's nothing in this record to demonstrate that Mr. Stark, in making this decision, did it based upon a racist intent, a racial animus. There's nothing. Can a corporation have that animus? The corporation, if there was a document in here that demonstrated a corporate policy that said no blacks can use the grand ballroom, then you could infer that if he was acting pursuant to a policy. But again, they've used the grand ballroom before. There's nothing in this record that suggests that for whatever reason we wanted to keep them out of that room because of their race. There's nothing that suggests that. We would love for them to come back. It's business. But the point is, on this situation, now, remember, Renetta Williams was African-American herself. And if there was a snafu, it was done by Ms. Williams. There's no inference to suggest that this African-American catering person was discriminating against the Panache group because of race. She had dealt with them the prior year. Okay? So there's nothing in this record that would reflect a corporate policy to keep the Panache group out of the grand ballroom. We've read it to them before. There's nothing here of slurs or any degrading sort of comments whatsoever. There's efforts here to accommodate them, which is further evidence, as we cite in our authorities, of an intent to work with them, and that this is not a racial issue. At best, you have a mistake. They can go and state court and try to pursue a breach of contract claim. We still believe that our records are our records. But the point is, is that in terms of discrimination, the claim that's presented before this body and before the district court, they failed to demonstrate the second prong, that in fact they were entitled specifically to the grand ballroom. They failed to demonstrate that they were similarly situated to the Cremonies, such that an inference of discrimination can exist. They've not provided any direct evidence of discrimination through slurs, through a policy, or other conduct that would say, you know something, that hotel is really a whites-only place. That's not the evidence at all. So what you have here is, I will end as I began, you're confronted with a situation where a simple customer service issue at worst is being converted into a race discrimination case, and that ought not be, that ought not be the law in this circuit. When you say they're not similarly situated, what is the distinction between the two groups? The first distinction is, is that the Cremonies group apparently contracted first. Secondly, the documents are They both contracted without reference to a room, right? That is correct. But in terms of our internal documents, the ones that Mr. Stark relied upon, those documents show that the Cremonies in our system had been reserved the grand ballroom when Panache had not. Okay. The other, they're also not Those are internal records unknown to Panache, right? Those internal booking records are something nobody knows about except they are in the records of the hotel. It's not clear to me, Your Honor, that previously to this event they had been given a copy of that. I don't know if at some point Ms. Williams reviewed the documents with them or not. I just don't know. But what I do know is, is that those are the documents that Ms. Williams initially input into the system, the person that they were working with, and those are the documents that Mr. Stark relied upon. And in a situation where you're making a snap decision, having no history whatsoever, it is not racist or unreasonable to rely upon your documents to assess who's entitled to this room. And again, in the absence of what we are suggesting here, every time you have a dispute, a waiter serves a table sooner than another table. Okay? In a diverse society that we have, you're going to always have situations where you're dealing with people of different races or different backgrounds or what have you. Every one of those disputes would therefore be subject to 1981. That is not what the law of the circuit should be. All right. Thank you. I would direct the Court's attention. Let me ask you this question. What are your damages? Well, the damages are as follows. They lost customers. They had typically every year they've had walk-in customers that would buy tickets at the door. They lost that. They had no walk-ins because there was no place to seat them. How much was a seat? How much was a seat? $75 a ticket. You don't get too many walk-ins at that price, do you? Well, actually, they do. And as a matter of fact, this year they're holding two shows, Your Honor. They're having a lunch and a dinner. It's quite a successful presentation. And they've done well by it. You're not having that at the Westin, are you? No, Your Honor. But I would like the Court to, there's a very important. Never know. There's a very important document, and that's our excerpt of Record 51, which shows the seating capacities for all of the rooms at the Westin. And this is a very important fact. The Kermany group was 250 people. They have three rooms, in addition to the Grand Ballroom, that will seat groups of over 300 in their banquet-style seating. It's a little bit hard to read the chart, but you have it. It's Excerpt of Record Number 51. The Grand, the Ballroom A and B combined seat 448 banquet-style. B and C combined seat 496 banquet-style. And C and D. Furthermore, there's an additional room, additional way of breaking up rooms. And the Concourse A and B seats 280. So the room where they put the Panache group seats banquet-style more than the Kermany group. And so you're looking at this fact again, that they never considered moving the Kermany group, when they had a room that would seat them. And yet what they did was they split up the Panache group. They split up 600 people. We understand all that. Okay. Have you tried to settle this case? Yes. To be honest, it's just token. Always be honest. Token, token, just insulting. Token. It's just like offering them champagne, free champagne, at the event. It doesn't address this issue seriously. Normally, I would think, just as a general proposition, that knowledge which employees of the company have, which relate to the subject matter of the dispute, would be attributed to the corporation. Is that true where you have a charge of intentional discrimination? Or is there some distinction there? Well, no. It has to be. Because if it isn't, then you have these, you know, corporate soulless entities that are allowed to go out and have discriminatory policies. Because people, people give the corporation their policies. They effectuate their policies. And one of the reasons ---- The discrimination, in your view, was Mr. Stark's? Yes, it was. I think that he took action on behalf of the hotel that was discriminatory. Let me ask you this. Have you thought about perhaps having the hotel, say, make a generous contribution to a charity of your client's choice or something like that? That's one way you settle these cases. You know, I think that one of the things, if you look at this case, which was shocking to me, maybe it doesn't shock the Court, but here's the Starwood Hotels. They are a $4.1 billion corporation with hotels all over the world. They don't have an anti-discrimination policy for dealing with the public. It's shocking to me. Well, if they don't discriminate, is it still shocking if they don't have a policy against discriminating? Yes. Because we all live in the real world, and you employ people that have their own agenda. And how can you fire people that do these kinds of things if they are not violating your company's policies? And, yes, Mr. Stark is still there. And until they do have a policy, they will continue to employ people and keep them in their employ who do these types of things. So would it be seen as discriminatory if they had moved the Carmani group? No, because the Carmani group was 250, and they would have given appropriate space. Okay. So what you could do is let me see. Does the hotel have an anti-discrimination policy in its manual? They all have these manuals. Only for its employees. What did you say? Only for its employees in dealing with each other, not for the public. Well, vis-a-vis the public, is there something, an anti-discrimination policy? There is not. I'm asking you, Counselor. I believe that there is. I do not believe it's the case that there's not a policy regarding discrimination in dealing with this guest. I think that's just not true. There is. They have one for their personal. Well, it's the law anyway, you know. Absolutely, Your Honor. I wholly disagree with that characterization. Well, I can just indicate for the Court, we requested it in discovery. And the only thing we were given is the exhibit that's in the excerpt of record number 96, which is their policy statement with regard to employees. If there are no further questions, I'll sit down. Well, have you ever gone to the ‑‑ we have a mediation service in the court. Have you ever gone to a mediation service? May I interrupt, Your Honor? Yeah, sure. I will say what I had said previously. We have attempted to resolve this matter afterwards. We have not put on the record exactly. Well, you're not going to resolve it by saying, well, next time you come here, we'll take $10 off each plate we serve. Or free, the complete event free. You know, there have been overtures made to them as a matter of customer service to allow them to come back and have the complete event free. For 1,000 people? For whatever they're ‑‑ in the grand ballroom. But the point of the matter is, that is what the token offer has ‑‑ that's what counsel refers as the token offer. Instead, they're looking for $100 million over what basically is a customer service issue. At worst. So we've tried, you know, a part of a company, they value their reputation and they value their customers. We've had them before. We would love to have them again. That's not the issue. The issue is we simply reject their characterization that what happened on May 13, 2001, was racist. It was not. We know that. We know that. All right. You know, I'm just ‑‑ just thought I'd put out a few seeds. But, well, you're here. Go out and talk. I mean, you know, if you're ‑‑ maybe one way you can do it is just put a page in the policy about treating customers. I'm sure that other hotels have it, I suppose. And then work out some other ‑‑ maybe a charity. That always seems to work. See, I'm an old district judge. I'd like to take in a room and bash a few heads. But I can't do that anymore. We accept the invitation. As do we. And just for the record, there are issues in discovery. So I do not accept the premise that there is no such policy regarding dealing with the public. Okay. I think we have free coffee. We forgot to put the coffee in this morning. And a little hot water. But the coffee is in there now. Thank you. All right. Let us know before you leave. But in the meantime, the matter is submitted. Yes, sir. All right. Well, you haven't taken all this, have you? You haven't talked to the people here? We'll take a recess. All rise. This court will stand at recess for approximately five minutes.
judges: Pregerson, Canby, Reed